On behalf of Mrs. Strykowski and Mr. Robert G. Black, on behalf of the City of St. Charles, Judy... Okay, the two of you know what you said, but what did you say? Cordner. Cordner. It's Herner. Herner. Herner. Oh, there we go. Yes. Mr. Black with a silent O. Mr. Black with a short A. You may proceed. Mr. Black, you have a motion to cite additional authority, do you not? Yes. Is there any objection? No, no. Thank you. It'll be granted. I believe it's Cook County v. somebody. It's Cook v. Oak Park. Oh, wait. To cite the case? Yes. Cook v. Village of Oak Park. Is that it? Yes. May it please the Court? Counsel? My name is Robert G. Black. This is fairly cumulative, isn't it? Yes, it is. My name is Robert G. Black. I represent the plaintiff, and we are seeking reversal of summary judgment and remandment for further proceedings. This matter is presented to this Court on summary judgment from a ruling on the so-called de minimis rule. One of the most basic things we know about summary judgment is it can't be granted unless there's a genuine issue of material fact. And one of the most basic things we know about the so-called de minimis rule is that it arises, as it is developed in the case law, so that there is no duty upon a municipality where there is a deviation in the difference between sidewalk slabs of less than two inches. That is how it's been developed, absent aggravating circumstances. And those aggravating circumstances, as they have developed, are things like poor lighting conditions, a lot of traffic in the area, public areas, and, as it has developed, where there is differences in both height and width in that area. Is it also commercial vis-a-vis residential? Commercial areas also. That would be a fourth one. In this situation, what we have here is testimony of record, evidence of record through depositions, pictures attached as exhibits. And in each and every instance, what we have is Plaintiff Karen and her husband, James, testifying that the difference in height is two inches, at least two inches, two to three inches. Plaintiff Karen and her husband, James, testifying the gap between is two inches or more, more than two inches. These are the only instances of testimony. They stand unrefuted, unrebutted. We have pictures that are attached. The pictures show a ruler placed inside to show the... I think it's a wooden ruler. I thought I read something about the fact that the thing had an end that would bend it out. Do you remember that? No, I do not because what I was looking at and what I recollect is a wooden ruler because when James, Plaintiff's husband, went back there by himself, he went back the day after and he went back five days after. He went back on his own. And part of the problem he was having is when he was trying to place the ruler at the bottom there, being a wooden ruler, without help, he couldn't get it to stand up straight, so he had to lean it against the back of it, so to speak. And the other problem he was having was there was debris and such at the bottom there, so he wasn't really able to get it to the very bottom there. So when it was being depicted in the pictures, there was a bit of a question just how far that ruler was down and actually measuring from the bottom. Also, what he testified to was the edges of the slabs were rounded. It doesn't come across real well in those pictures. I mean, they're not sharp edges or anything like that. Right angles. Right angles. That's a better way to put it. Sharp edges is not a good way. But they're a bit rounded. And it's kind of hard to tell where with that rounded edge in the pictures, the measurement really ends off. I mean, I can look at these and say, I mean, I think it's a reasonable thing to say that is they depict more than two inches, quite frankly. But be that as it may, these are all genuine issues of material fact. Unrefuted testimony that takes it, and evidence that takes it outside of the de minimis rule. Be that as it may, let's say we are still. What about the aggravating circumstances of the lighting? Wasn't it the plaintiff's obligation to present expert testimony with regard to the lighting? No, Your Honor. I don't think so. I know that's been raised as an issue. And I know that my next point was going to be, even if this was not a de minimis issue, there are aggravating circumstances. And the main aggravating circumstance is the lighting issue. I know that there's been a suggestion whether there should be expert testimony to that effect. But I think that what we have here is a plaintiff and her husband testifying, we didn't see it because of the poor lighting. Now, the case that talks about the parking deck, and that's the one where expert testimony arises, and that's the El Gati case, that's a case where expert testimony fits in uniquely, because in that case there was about a quarter-inch difference or whatever in the flooring that you couldn't see or pick up because the paint wasn't the same. And you couldn't, there was a difference or an issue with the vision impairment because the paint was the same. So the expert had to come out there and say, the reason you can't tell the difference even though it's very de minimis is because of the paint issue. Whereas not being able to see at night because the lighting is poor, I don't think that that's the subject of expert testimony. I think that right here, this is what people can testify to, and if they testify to it as unrefuted, that's in the record, and that's a matter of summary judgment, and that's for something for the jury to do at all. The hearing was unrefuted. The poor lighting quality was unrefuted. There's nothing else in the record other than both of them stating it was too dark to see, the lighting was poor, there was a lamppost off to the side, but it gave off minimal light. And I know this, you know, the suggestions are made, and the city's briefed that this is right on Main Street and there's other restaurants by and all these other factors for the jury. We did cite the Cook v. Oakbrook, Oak Park case. It has striking similarities to this matter. That one occurred July 25, 2015, one month before the fall here. That one... Same phase of the moon? I don't know. I didn't check that one, Your Honor. I wish I would have known. Dark, dry, midsummer night, just like this. A busy area, just like this. That one was near a bustling park is the phraseology that was used. That case depicted no street lights within a 50-foot area, and talked about it being dark. Plaintiff fell forward like the plaintiff did here. But it was in a residential area, wasn't it? No, it was on her way. It was near a park. She was on her way home from work. I don't know that the opinion was real clear of whether it was a residential area or not. I would submit or agree that there would be a difference between Main Street, St. Charles, and this area where she's at, yes. Well, it's not so much commercial, is it, as it is high volume, which would lend itself to a commercial sidewalk. At this time of year, a lot of residential areas are high volume, because people stop by to see all of their lights and things like that. It would lend itself more to the issue of having some sort of notice or constructive notice that that defect is there. But in this case, pictures and measurements were taken the same day, same thing. The next day, sorry, same thing. Life said it was two inches or over two inches. The village said it wasn't. Then they later conceded, well, maybe with the bottom of the ruler taken into account, it might be two inches. Trial court said no dispute as to the size of the deviation. Found it was de minimis and not actionable as a matter of law. Pretty much the same ruling here. And the appellate court reversed. Can't be de minimis. That's for the jury to resolve. That's what the appellate court said. There was also evidence of aggravating circumstances, poor lighting conditions, heavy foot traffic in the area surrounding the sidewalk where the plaintiff fell. These are all for the jury. And it's generally also a question for a jury whether a defect existed a sufficient amount of time, that the village should have been aware of its existence. Those are the three holdings or the three parcels of the holding in Cook v. Oak Park. We also go back, too, for a moment to the issue of constructive notice, in addition to it being on the busy thoroughfare. There was also testimony and pictures of vegetation, little bits of weeds and types of things that are growing at the bottom and between the slabs. And testimony to that effect. Again, issues for a jury to resolve that are not resolvable by a court by way of summary judgment. We did cite the case law, Barrett, Bartkowski, where the courts dealt with situations where they were unquestionably from the testimony de minimis settings, but aggravating factors existed so that they should go before a jury. And those were situations where the aggravating factors were bad lighting, commercial area, which is in Barrett, heavy traffic area in Bartkowski. That was the Aurora train station parking lot case. And in Barrett, that was kind of a, I think they referred to it not quite as a pothole, but something where there was a break in the pavement. And the court stressed that this was both a width and a depth issue. The same thing with the West case that we cited, which was the case outside the car wash. Tripped and fell outside the car wash in Hoopson, West versus Hoopson. That deviation was two inches wide, so it was sufficient to put the, put him on notice there, that a reasonable man on notice or a reasonable person on notice to anticipate someone might be injured there. But now in the Cook case that you gave us, the facts there were somewhat different. I mean, there a neighbor testified that the deviation was noticeable for, I think he said, 10 years. And that village personnel were often out there taking a look. We don't have any of that here. Yes, Your Honor. Those facts are completely different. Right. Absolutely. That neighbor there talked about the workers had come out 10 times to look at that area, and he testified that condition existed for two years. So those facts are very much stronger in favor of aspects of constructive notice than anything that we have here. Absolutely. That is the difference between Cook and our side, most assuredly. But, excuse me, so it's our position, it is our position that from this record, that the trial court erred in granting summary judgment. I just will note also one further thing, that Jason Bourne, who is the person supervisor from the city who testified, testified that they go out and go look at these defects or deviations or whatever when it was an inch and a half. So the city was recognizing that it was their obligation, it was an inch and a half. I don't know what this means in the overall scheme of things, vis-a-vis the magical two-inch de minimis rule, but I mention that because that is in the record. But there was a red dot, wasn't there, that was noticed? Yeah. And that would have indicated that the city might have been on notice of that, unless it was Julie who marked it. You know, it's very unclear what that red dot is. I mean, we know that there's a red dot spray painted there, and we know that the city said they go out and they paint where there is something that needs to be done. Right. But it's very unclear what that means, that red dot. If you take on its value that a red spray painted dot is different from painting something, the net is different. We don't know what that is. We just know that it's in the picture. I will reserve the rest of my time for rebuttal. Thank you very much. Very well. Thank you. Ms. Kerner, you may proceed. Thank you. May it please the Court, Counsel, obviously this is a disposition that the trial court did not err by granting summary judgment. I will address the Cook matter first, as at least not something I got a chance to discuss when the briefs were done. This case is completely different from the case in front of your audience. Would you move the microphone up so it's— Oh, I'm sorry. Usually I move so loud that I usually try to keep it back, so I apologize. No, this is a big room with high ceilings, so— Big room.  That's okay. The one thing I think about Cook that I noticed is that there was a dispute about the size of the defect in there, that the plaintiffs argued that it was in excess of two inches, and the defendant said it was less than two inches and was an inch and a half. My point here is that even if there was an argument in terms of what the discrepancy was of the height variance, the court took it, the trial court took that higher amount in favor of the plaintiff. So we weren't disputing. We said, regardless of what the plaintiff said with respect to that height variation, we will take that as true, because actually what he testified to was it was between an inch to two inches. And the court noticed that you thought it was a tape measure, but it actually wasn't. It was a wooden ruler. The issue that we had with it is where the bottom of the ruler was, because he was shoving it down into the expansion joint, which was there between the sidewalk slabs, and he was pushing it all the way down into the bottom so that therefore he wasn't measuring the height variation from the surface of the lower slab to the surface of the higher slab. You're saying that the hole could have been a mile and a half deep, but the slabs were only half an inch variation in height? Correct. So, and the issue here really was that this isn't a trip case. This is a slip case. She's actually moving away. I thought I read that her heel went inside the space between the two slabs. Very true. So we're not talking about the height variation then between the slabs. He's trying to argue that it's the expansion joint, the size of the expansion joint, which is anywhere, again, if you look at the wooden ruler, it shows less than an inch, but at different times I believe Mr. Strakowski testified it was an inch and a half. The problem is we were given 80 photographs, right? We were given 80 photographs of this entire area outside of the Hotel Baker and taken at different positions. He couldn't tell us where these specific heights and measurements were with respect to where Mr. Strakowski actually fell. The only time you can really gauge that is when you can see the red bricks that are surrounding the light pole that is right there. That tells you exactly where she was at. And then you have the pictures of the expansion joint right adjacent to that red brick area. That's where you can tell basically where she is.  Sure. Most sidewall cases are based upon where someone stubs a toe, a shoe, the back of their heel, because there is a tight differential between one slab versus another. They don't usually fall into a hole or their heel or their foot doesn't go into a hole per se. That makes this case somewhat different, does it not? Well, there were two cases that we did talk about where they are getting heels caught in holes, but those are potholes. But you can't think of this as a hole. This is the expansion joint. As this court, I'm sure, is well aware looking at any sidewalks, sidewalks must by necessity have seams, and they must by necessity have expansion joints because of freeze-thaw and the ability for the sidewalks to contract like heave and thaw and get smaller. So these are expansion joints. These are seams that are at regular intervals. Are you saying that based upon physics that the larger the slab, the more contraction and expansion, and therefore the larger the space between the two seams? I can't speak to physics. What I can say is that Jason Bourne did testify that the need and necessity for these expansion joints and that the expansion joint when he saw it was no more than an inch and a half. So what I'm saying is that we're still talking about a de minimis condition in terms of the expansion joints, and it's something that people would be stepping on normally if they were just walking across this. And as I said, she says that she slipped down and that her heel got sort of... Weren't expansion joints at one time filled with felt? I don't know about that. You don't know about that. I don't know, but I do know that there was... When I was a kid, they were filled with felt. And then they went to some sort of silicone rubber. And that's what we had. And then maybe some plastics. But the point is that, yes, expansion joints exist, and typically expansion joints have a fibrous compressible filler that basically fills the space while hopefully keeping dirt in the water or at least accumulated water out of the seam so that it doesn't cause more damage in the frost-free stock. So I guess I'm using my common sense and everyday experience in life and knowing that there are expansion joint fillers, and one of them is fiber. It looks like a long cord. And also I believe there was testimony in this case about using silicone rubber out of a tube or some sort of injector to inject into the seams that would fill this hole as well. Is that not correct? Absolutely. It's caulk. I think that Mr. Warren testified. It's silicone caulk. So is that what was seen or observed or testified to, where there were some remnants of caulk along there? I believe so. So that's one of the things that Mr. Strakowski mentioned is he was having a hard time getting the ruler down into the expansion joint because of the presence of debris in the caulk and the dirt or whatever other debris he was describing. So there is evidence of caulking in some of the expansion joints. The areas where Mr. Strakowski fell, they believe that the caulk may have been missing from that location. So even assuming the difference is de minimis, were there not aggravating circumstances here due to the lack of lighting? There was testimony by the plaintiff as to the poor lighting conditions. As we discussed before in our brief, that testimony is merely anecdotal. I mean, the plaintiff is just sitting there. But there was testimony that was not controverted in any way by the city, was it? That's true. That's because there was no expert testimony that went back and forth with respect to lighting. Well, does there need to be expert testimony? Is there authority that says there has to be expert testimony? I don't know that there's authority that says it. It was addressed in the Barcoyak case, and I think that they addressed it in the O'Kady case in terms of talking about the standard lighting in the parking lot that was involved there. But this roadway is Illinois State Route 64. So IDOT maintains all the lighting along that street. And, in fact, like I said, there was a light pole right there. And there's all sorts of other external lighting sources around there. Was there testimony as to what those external lighting sources, did the city put on that testimony as to what the external lighting sources were? I did not. I mean, we did discuss the area where it was located being in 64, being the fact that there would be traffic going by, and the fact that it was right outside of the bar rocks that was part of the hotel paper. And, again, the light pole you can see right in some of the pictures that were presented. There's no evidence that the light was out. Obviously, there was a lighting fixture there, obviously. But, no, I mean, we didn't get to that lighting point in terms of the aggravating factors that the plaintiff had raised. Were there any photos taken at night? I don't believe so. Now, the caulk that is in this expansion joint or in this joint is obviously there for a purpose. And if most of it is now on the bottom of this little opening, then it's not serving its purpose, and it's not designed to last forever. Isn't that some indication of an aggravating circumstance that knowing it won't last forever that there should be some sort of inspection on a regular basis and that if there had been, and now that little red mark may or may not have some relevance if somebody from the city did an inspection and noted that, isn't that something that we should take into account? I believe that's actually, Your Honor indicated that there are many reasons for the caulk to be there. Most of it has to do with maintaining the integrity of the sidewalk slabs itself. I mean, whether or not that inch and a half when you're stepping on a seam in the sidewalk when you're stepping on it, you wouldn't expect anybody to have an issue or a trip or a slip patch. If you step on it with the ball of your foot, no. If you step on it with your heel, that's very possible. I mean, it could have gone through the caulk itself, but it's not likely because it does have about, I think, without being stepped on, it usually has about a 15-year expectancy, maybe it's less. But women's heels are a little different than just a combat boot walking on a solid surface. So, I mean, the point is, even if there wasn't a height and she had gotten down in there with a heel, that seems to indicate that something needed to be done there because there was no caulk to prevent her sinking, so to speak. With all due respect, I don't know that we have to have the sidewalks in perfect condition for everybody with respect to the type or the nature of their footwear. Well, that's true. But if there had been better lighting or if this had been in the daytime, they might have been able to see this. But the fact remains that they said they didn't see it. I think the de minimis rule says you don't have to have it perfect. But there are qualifications. One other thing I wanted to add about aggravating circumstances. There were no aggravating circumstances here other than the plaintiff's testimony that was dim, not dark, but dim. And there's no other, like, bustling and there's not a lot of other pedestrians here. The Cook versus Oak Park case that we talked about, they also focused on the fact that it was near a very busy area in terms of that park and that there were a lot of people out. And then there's also one of the other cases that we cited that talks about at the train station, where there's obviously when you're talking about a parking lot, I mean, it's also completely different in terms of there's cars that are moving about. Cars present a very larger hazard to a pedestrian that are walking through, which is going to distract the pedestrian from looking for that greater hazard while they're trying to get to their car in a very hurried manner. The plaintiff in this case indicated that she was not distracted. There were no other pedestrians. The only pedestrian, I think, that was out there walking away from the hotel, the hotel maker, was far enough ahead of her, and she wasn't being distracted by any of that. And again, I just, the fact that, not the fact. Our position is that the court looked at all these factors. The court did not err. This case is very comparable to this court's decision in both the Hartung and Martin matter, which have very comparable facts to this. And the one thing in the Cook v. Oak Park matter is that one of the aggravating circumstances in terms of the lighting was there weren't even streetlights anywhere from where this person, she fell. I think the court said that the closest streetlight was 50 feet one way and 50 feet another way. So you're talking about there's this huge 100-foot gap from this one area that she fell, which I think the court considered in terms of looking at that. So again, sorry, a little far afield. Again, I'll just wrap up then. Most everything is put in the brief. I didn't mean to come and belabor any of those points. I believe the trial court was accurate in its decision in finding that it was a de minimis condition. And I know I didn't address it again, but there is the issue of constructive notice, from which the court also found in the city's favor. And I don't think that was ever, that wasn't refuted by the plaintiff, that we did have constructive notice other than this claim about a weed being in one of these gaps, which again is not anywhere, there's no testimony that it was anywhere near this area. And again, so thank you. Thank you. Mr. Black? Thank you, Your Honors. Just a couple of points. Counsel was talking about the area as an aggravating factor, whether it was well-traveled or busy. There is no question that, but at that time, they testified that it was not busy at that time. But this is still an area along Main Street 64 that is otherwise well-traveled and busy. We did talk about how this is a somewhat unique situation. We mentioned this in the brief, that the heel fell into this difference, this deviation between the two, in the expansionary, between the two slabs, and she fell forward. And that's why we cited both Barrett and Bartkowski, this court's decision in Bartkowski, as being the same type of situation where the shoe basically fell into a hole or otherwise. It was not the tripping kind of sensation. It's where the shoe impacted and fell in. Your Honor made the statement that women's heels are a little different. I'll go with that, and I'll take your word for that. And I'm sure that that is the case here. But when we're also looking at this, too, we've got the difference in spacing. The testimony was also that they were walking westbound. The difference in height, the higher side, is on the western side, so to speak. So I don't know how that impacted and how the heel got stuck on there. Did the higher side also have an impact on that in addition to it being that spatial situation? I don't know. One thing that kind of popped into my mind when we were talking about the caulk and the caulk being there and all the repair aspects of caulk, and it just for some reason came to me that, well, if there's already been caulk down there, where did the caulk come from? Is it because the city's already been trying to do some work there?  Again, would that be a question of fact, or would that be applied to the minimalist issue that they had? Well, I think that is actually a question of fact going to the notice issue and directly to the notice issue. So unless there's any other questions, to summarize. Did anybody take a measurement of the size of the slabs as far as square footage? Not to my knowledge. Length and width? Not to my knowledge. But we do have the testimony of James and Karen, the plaintiff, reiterating that the gap was two inches. And you see the size of the heel there in the pictures. Do you understand rates of expansion? Not entirely. That would be for the expert. Well, assuming that it's a quarter-inch expansion for every foot, and if it's a ten-foot by ten-foot slab, it's ten-quarters of an inch. Okay. That means the hole has to be two-and-a-half inches, except the other slab, if it's also the same size, may mean also that it's got to be another two-and-a-half inches. So now you're talking five to six inches of space between the slabs. That's probably the reason why the slabs aren't gigantic, because the bigger they are, have you ever driven over a bridge and you notice that the gap, the expansion gap, sometimes is four or five inches? You could actually put your foot through the hole on an expansion or on a bridge expansion joint? Sure. So the reason why I was asking what was the size of the slabs indicates what the optimum size of the space should be between the slabs. Okay. If the slabs are two feet by two feet, normally a two-inch space is a little bit big, but if they're ten feet or fifteen feet, maybe they're normal. Maybe that's the minimum. So maybe they should have designed it improperly, because the slabs shouldn't be such that people are going to have their heels fall into them. But I'm just throwing out little tidbits of scientific logic based upon intergalactic metaphysical philosophy. Science and philosophy are not my things, Your Honor, so I appreciate that. And it has been a while since I've driven by there, and maybe I'll drive by there on the way out. I may have driven by there and just in passing noticed that the slabs were relatively large. That's not in the record, so I'm going to just resign. That is my recollection, but I don't want to say anything that's not true. Just to summarize, we would then ask that the summary judgment be reversed. And if I may, Your Honor, on a personal note, I am pleased that by fortuitous circumstance or happenstance that I get to do the sum up the last argument in here for Mr. Mangan as clerk of the court, and I'm just very pleased and proud that that just happened. So thank you. Nice that you said something. Should we get a plaque for that? Sure. Okay, court's adjourned.